**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| VILMA LOPEZ, | ) |
| *Plaintiff*, | ) 2:07-cv-00957-RCJ-RJJ |
| vs. | ) **ORDER** |
| AMERICAN FAMILY MUTUAL INSURANCE COMPANY, | ) |
| *Defendant*. | ) |

**I. INTRODUCTION**

Before the Court is Defendant American Family Insurance Company's Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56 (#35). In the present motion, Defendant moves for summary judgment on all claims except for the breach of contract claim. The Court has considered the pleadings and arguments on behalf of both parties. IT IS HEREBY ORDERED that Defendant's Motion for Partial Summary Judgment is GRANTED. (#35.)

**II. BACKGROUND**

**A.     Medical Facts**

On February 12, 2005, Plaintiff Vilma Lopez was involved in an automobile accident with Stephen Sandford ("the tortfeasor"). Plaintiff's vehicle was seriously damaged and would later be declared a total loss. She was taken by EMS to University Medical Center and underwent CT scans of her brain, facial bones, abdomen, and pelvis, all of which were negative. (#42 Ex. 1, Report of Charles A. Bloom, D.O., at 2.) However, Plaintiff was diagnosed with a "right complex lip

laceration, 2.5 cm in length" which went "through and through her lip." (#42 Ex. 1, Operative Report of Shawn Tsuda, M.D.) The laceration was repaired with sutures, but Plaintiff was informed that the injury would leave some permanent scarring even after repair. (#42 Ex. 1, Surgical Consultation of Shawn Tsuda, M.D. at 2.) Plaintiff was also diagnosed with low back strain. (#42 Ex. 1, Report of Charles A. Bloom, D.O. at 2.) Plaintiff was prescribed Motrin, Lortab, and antibiotics, and was subsequently discharged. (*Id.*)

On February 14, 2005, Plaintiff began treating with chiropractor Neel Khurana, D.C. (#42 Ex. 3, Patient Initial Contact Report at 1.) During her initial consultation with Khurana, Plaintiff "rated her overall pain as a 10/10 with 10/10 being the worst pain ever experienced." (*Id.*) Khurana diagnosed Plaintiff with "sprain/strain of the cervical, thoracic, lumbar and lumbosacral spine, acute posttraumatic intervertebral segmental dysfunction of the cervical, thoracic, lumbar and lumbosacral spine with associated myospasms, [and] whiplash associated disorder with decreased range of motion and paraspinal point tenderness." (*Id.* at 2.) Khurana described Plaintiff's prognosis as "[g]uarded due to the severity of [her] injuries," and estimated that Plaintiff's total treatment time would be "approximately 3–4 months of continuous chiropractic care and physical reconditioning." (*Id.* at 2.) Over the ensuing four months, Plaintiff underwent twenty-three treatment sessions with Dr. Khurana. (#42 Ex. 3, Patient Ledger at 1–3.)

On March 1, 2005, Plaintiff sought consultation with Dr. Jaswinder Grover at Nevada Spine Institute. (#42 Ex. 4, Report Dated 3/1/2005 at 1.) Plaintiff complained of neck and low back pain, tingling and paresthesias in the upper and lower extremities, and headaches. (*Id.*) At Dr. Grover's direction, Plaintiff had a series of MRIs taken. The shoulder MRI was normal. (#42 Ex. 4, MRI of the Left Shoulder Without Contrast.) The wrist MRI revealed a small ganglion cyst, which "correlate[d] with the site of clinical concern." (#42 Ex. 4, MRI of the Left Wrist Without Contrast.) Dr. Grover hypothesized that Defendant may have injured her wrist by tightly gripping the steering wheel at the time of the collision. (#42 Ex. 4, Report Dated 3/17/2005.) The spine MRIs showed

1  various preexisting degenerative and genetic conditions, which apparently made Plaintiff more
2  susceptible to injury in case of trauma. (#42 at 5:4–9.)

3        On June 21, 2005, Plaintiff was discharged from chiropractor Khurana's care. (#42 Ex. 3,
4  Patient Discharge Report.) At the time of her discharge, Plaintiff's complaints were apparently
5  limited to "subjective mild stiffness." (*Id.*) Khurana's discharge report described Plaintiff's range
6  of motion and deep tendon reflexes were both described as being "within normal limits in both the
7  cervical and lumbar spines." (*Id.*) Khurana described Plaintiff's prognosis as "fair." (*Id.*)

8        On July 7, 2005, about two weeks after her discharge from Khurana, Plaintiff returned to Dr.
9  Grover. (#42 Ex. 4, Report Dated 7/7/2005.) Plaintiff complained of ongoing pain, difficulty
10 sleeping, and stiffness. (*Id.*) Dr. Grover determined that Plaintiff was in a substantial amount of
11 pain and was not responding to conservative treatment. (*Id.*) Dr. Grover recommended that Plaintiff
12 undergo steroid and nerve blocker injection therapy to help control her pain. (#42 Ex. 4, Report
13 Dated 7/7/2005.)

14       Plaintiff did not return to Dr. Grover until March 30, 2006. (#42 Ex. 4, Report Dated
15 3/30/2006.) At that time, Plaintiff complained of back pain, neck pain, interscapular pain, and pain
16 in her extremities. (*Id.*) Plaintiff was due to deliver a baby, and Dr. Grover delayed additional
17 treatment until Plaintiff was postpartum. (*Id.*) By May 30, 2006, Plaintiff had delivered her baby,
18 and Dr. Grover ordered another set of MRIs. On August 3, 2006, Dr. Grover analyzed the MRIs and
19 again recommended that Plaintiff undergo steroid injection therapy. (#42 Ex. 4, Report Dated
20 8/3/2006.) Plaintiff's medical records show no further visits to Dr. Grover, and to this day she has
21 apparently not received any of the recommended injection therapy. (#35 at 9:4–5; see generally #42
22 Ex. 4.)

23       Finally, on July 11, 2006, Plaintiff consulted with plastic surgeon Stephen A. Gordon, M.D.
24 to inquire about scar revision surgery for the scar on her lip. (#35 Ex. W.) Plaintiff was informed
25

that the surgery would cost $3,580 (*id.*), and that the scar's appearance would be reduced by approximately 75% (#35 at 9:22). Plaintiff has not had the scar revision surgery. (*Id.* at 9:10–12.)

### B.  Insurance Facts

Both the tortfeasor and Plaintiff carried auto insurance policies with Defendant American Family Insurance Company.[1] The present lawsuit centers around alleged wrongdoing concerning Plaintiff's underinsured motorist claim. ("UIM claim.")

On February 15, 2005, three days after the accident, Plaintiff's attorney sent a letter of representation to Defendant's claims department. (#35 Ex. A.) The letter requested that Defendant "verify [their] coverage regarding [Plaintiff], including medical payment, UM/UIM coverage and the limits thereof, since it may become necessary to file a claim under the referenced policy." (*Id.*) Two days later, on February 17, 2005, Defendant sent the requested information to Plaintiff's attorney. (#35 Ex. B.) On June 24, 2005, Plaintiff's attorney again contacted Defendant and requested the medical log sheet for Plaintiff's policy. (#35 Ex. C.) Defendant provided that information on June 27, 2005. (#35 Ex. D.) There was no further communication between the parties for nearly one year. During this time, Defendant apparently did not perform any additional investigation on Plaintiff's potential UIM claim. (#42 at 6:23–25.)

There is some dispute as to whether Defendant informed Plaintiff that she could use her rental car reimbursement coverage to obtain a rental vehicle after the accident. (#42 at 7:11–8:9.) The tortfeasor driver's third-party rental coverage expired on March 17, 2005, approximately one month after the accident. (#42 at 7:15.) At that time, Plaintiff's car had still not been repaired or evaluated as a total loss. (#42 at 7:15–18.) Plaintiff carried $750 worth of rental reimbursement coverage with Defendant. (#42 at 7:12–13.) It is apparently Defendant's policy to inform their insureds of all of their coverage options. (#43 at 7:19–8:10.)

---

[1] Some of the materials presented by the parties describe this case as a "double AmFam." This term refers to a situation where both drivers involved in an automobile accident are insured by American Family.

1    On June 19, 2006, Plaintiff's attorney sent a formal settlement demand package to Defendant and requested that Defendant tender Plaintiff's UIM policy limit of $100,000. (#35 Ex. E.) The demand letter enumerated $19,874.54 in medical expenses. (*Id.*) The letter also noted that the records from UMC and Dr. Grover were incomplete, and the expense figures listed for those two providers were "pending" further documentation. (*Id.*)

On June 30, 2006, Defendant acknowledged their receipt of Plaintiff's demand package and requested further information from Plaintiff. (#35 Ex. F at AF 0072.) Defendant requested: (1) a declaration page confirming the tortfeasor's policy limit and a copy of a settlement check for that policy limit; (2) a current photo of the scar Plaintiff received in the accident; (3) photographs of the damage to Plaintiff's vehicle and a copy of the damage report; (4) complete medical records from UMC and Dr. Grover; and (5) a future treatment plan with prospective costs for future care if any was required. (*Id.*) Plaintiff apparently never returned this release form. (#35 at 5:8.)

On July 14, 2006, Plaintiff's attorney submitted photographs of Plaintiff's scar and Dr. Grover's May 30, 2006 report, but none of the other requested information. (#35 at 4:15–16.) The letter from Plaintiff's attorney also stated that Plaintiff would soon begin the steroid and nerve blocker treatment that Dr. Grover had suggested. (*Id.*) On July 19, 2006, Defendant acknowledged its receipt of Plaintiff's July 14 letter and reiterated its request for a copy of a settlement check from the tortfeasor, complete medical records from Dr. Grover and UMC, photos of Plaintiff's vehicle and a damage report, and a future treatment plan. (#35 Ex. H.) Defendant also requested wage loss verification on Plaintiff's employer's letterhead, which was a new request that did not appear in Defendant's June 30 correspondence. (*Id.*)

In September of 2006, Plaintiff settled with the tortfeasor for his policy maximum of $100,000. (#35 Ex. I.) Of that settlement, Plaintiff apparently received about $60,000 net of medical expenses and attorney's fees. (#35 Ex. Y at 36:19–21.) The December 10, 2008 deposition of

1  Plaintiff's husband revealed that Plaintiff spent the proceeds from the lawsuit against the tortfeasor
2  on a house. (*Id.* at 37:1–9.)

3        On September 13, 2006, Plaintiff's attorney sent to Defendant the MRIs that Dr. Grover
4  ordered on May 30, the invoices for those MRIs, and a cost estimate for Plaintiff's scar revision
5  surgery. (#35 Ex. J.) On September 28, 2006, Defendant confirmed its receipt of the September 13
6  correspondence and once again reiterated its request for a copy of the settlement check and
7  declaration page, wage loss verification, medical records from UMC and Dr. Grover, and photos of
8  Plaintiff's vehicle. (#35 Ex. K.) When Defendant received no response, it sent a letter requesting
9  the information a fourth time on October 25, 2006. (#35 Ex. L.)

10        In November of 2006, one of Defendant's claims adjusters, Brigitte Schrader-Frith, sought
11  authorization to settle Plaintiff's claim for between $10,000 and $20,000. (#35 Ex. M at 195:14–21.)
12  At her deposition, Ms. Schrader-Frith testified that she did not believe that Plaintiff's claim
13  presented any UIM liability, but she wanted to "at least give some kind of consideration and see if
14  [she] could settle the claim and get a release." (*Id.* at 195:19–21.) In an attempt to get authorization
15  to make the offer, Ms. Schrader-Frith submitted a Casualty Investigation Report to her manager with
16  an attached handwritten note that read, "Total value $110-120, autho to settle 9-19." (#42 Ex. 21.)
17  The manager did not grant authorization to settle the claim, and the claim was subsequently denied.
18  (#35 Ex. N.) In a letter to Plaintiff, Defendant concluded that Plaintiff was already fairly
19  compensated by $100,00 settlement with the tortfeasor. (*Id.*) The rejection letter indicated that
20  Defendant would be willing to consider any further information provided by Plaintiff about the
21  claim. (*Id.*)

22        On June 17, 2007, Plaintiff filed the present lawsuit. By November 14, 2008, Plaintiff had
23  apparently made all of her medical records available to Defendant. (#42 at 20:22.)

24

25

### III. DISCUSSION

**A.   Legal Standard for Summary Judgment**

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). As summary judgment allows a court to dispose of factually unsupported claims, the court construes the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazari*, 84 F.3d 1194, 1197 (9th Cir. 1996).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *Id.* As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes which are irrelevant or unnecessary will not be considered. *Id.* Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323. Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Id*.

**B.   Causes of Action**

Plaintiff asserts six causes of action against Defendant in connection with the denial of her UIM claim: (1) breach of contract (not at issue in this motion); (2) intentional infliction of emotional distress; (3) breach of the implied covenant of good faith and fair dealing; (4) violation of the Unfair

Claims Practices Act; (5) breach of fiduciary duty, and (6) estoppel. Defendant has moved for summary judgment on all claims except for the breach of contract claim, which Defendant asserts is subject to binding arbitration. Defendant has also moved for summary judgment on punitive damages, claiming that Plaintiff does not meet the standard set out in N.R.S. 42.005 as a matter of law.

### 1. Plaintiff's Intentional Infliction of Emotional Distress Claim

Plaintiff's complaint included an allegation that Defendant's handling of her UIM claim amounted to intentional infliction of emotional distress. The Nevada Supreme Court has defined the standard for IIED as follows:

> To recover for the intentional infliction of emotional distress, a plaintiff must establish the following elements: (1) that the defendant's conduct was extreme and outrageous; (2) that the defendant either intended or recklessly disregarded the causing of emotional distress; (3) that the plaintiff actually suffered severe or extreme emotional distress; and (4) that the defendant's conduct actually or proximately caused the distress.

*Nelson v. Las Vegas*, 99 Nev. 548, 555 (Nev. 1983). Plaintiff concedes that the evidence presented in the case at bar does not support an IIED claim. (#42 at 3:7–8.) Thus, the Court GRANTS summary judgment to Defendant on the IIED claim.

### 2. Breach of the Implied Covenant of Good Faith and Fair Dealing ("Bad Faith")

Nevada law recognizes an implied covenant of good faith and fair dealing in any contract. *A.C. Shaw Constr. v. Washoe County*, 105 Nev. 913 (Nev. 1989). "To establish a prima facie case of bad-faith refusal to pay an insurance claim, the plaintiff must establish that the insurer had no reasonable basis for disputing coverage, and that the insurer knew or recklessly disregarded the fact that there was no reasonable basis for disputing coverage." *Falline v. GNLV Corp.*, 823 P.2d 888 (Nev. 1991); *see also Powers v. United Servs. Auto. Ass'n*, 962 P.2d 604 (Nev. 1998). Stated another way, an insurance company is not liable for bad faith if it had a reasonable basis for denying a claim. *See American Excess Ins. Co. v. MGM Grand Hotels*, 729 P.2d 1352, 1355 (Nev. 1986) (per curiam). The reasonableness of an insurer's claims-handling conduct is generally a question of fact. *Amadeo*

*v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir.2002). The Nevada Supreme Court has held that "a jury question on [an] insurer's bad faith arises when relevant facts are in dispute or when facts permit differing inferences as to the reasonableness of [an] insurer's conduct." *United Fire Ins. Co. V. McClelland*, 780 P.2d 193, 197 (Nev. 1989). *See also Amadeo v. Principal Mut. Life Ins. Co.,* 290 F.3d 1152 (9th Cir. 2002).

Defendant asserts that, as a matter of law, it behaved reasonably in denying Plaintiff's claim. Defendant asserts that the medical records that Plaintiff made available indicated that she needed no further medical treatment. Defendant also contends that Plaintiff's failure to provide medical records and other information central to her claim was indicative of a pattern of deception. The evidence demonstrates a good faith basis for the denial of Plaintiff's claim on these facts.

      **a.    Plaintiff's Medical Records**

It was reasonable to deny Plaintiff's UIM claim based on the medical records she provided. The medical records included in Plaintiff's June 19, 2006 settlement demand package provided an assessment as to her condition and prognosis. The June 21, 2005 discharge report from chiropractor L. Neel Khurana indicated that Plaintiff was experiencing only "mild stiffness." The report further indicated that Plaintiff's range of motion and tendon reflexes were normal. These pieces of evidence seem to support the conclusion that Plaintiff was nearly fully recovered, and that she was adequately compensated by the $100,000 settlement she received from the tortfeasor.

Defendant points out that Plaintiff had an eight-month lapse in medical treatment between July 7, 2005 and March 30, 2006. (#35 at 8:26.) Such a lapse in treatment seems inconsistent with Plaintiff's assertion that her pain is severe and uncontrollable. Defendant also emphasizes that, to this day, Plaintiff has not yet had any of the injection therapy recommended by Dr. Grover (*id.* at 9:10–12), which also undermines Plaintiff's assertion that she has "insidiously progressive" and uncontrollable pain. Defendant notes that Plaintiff has not had the scar revision treatment recommended by Dr. Gordon, which suggests that she may not be as self-conscious about the scar

as she alleges. (*Id.*) Finally, Defendant points out that Plaintiff used the proceeds from her $100,000 settlement with the tortfeasor to purchase a house rather than obtain medical treatment. Based on the chiropractor's report, and despite the ongoing physical complaints Plaintiff had for her other physician, Dr. Grover, Defendant was reasonable in denying her claim on these facts.

        **b.**    **Plaintiff's Failure to Provide Medical Records and Other Information**

Plaintiff's failure to provide medical records and other information also supports a finding as to the reasonableness of Defendant's denial of her claim. Defendant alleges that Plaintiff "jealously guarded" her medical records, which is indicative of a "pattern of deception and on the part of Plaintiff Lopez that more than justified American Family's claims-related decisions." (# 49 at 9:21–24.) Defendant repeatedly requested Plaintiff's full medical records from UMC and Dr. Grover, and Plaintiff apparently did not provide a full medical release until November 18, 2007, well after litigation had begun. (#42 at 14:20–24.) Defendant had no way of knowing what records it was missing at the time of the denial of the claim and reasonably denied the claim based on the incomplete medical records provided to it.

Defendant also asserts that its decision to deny Plaintiff's claim was reasonable because of "Plaintiff's consistent refusal to provide information central to her claim." (#35 at 17:3.) Defendant most likely refers to a copy of the settlement check from the tortfeasor driver, pictures of Plaintiff's automobile, and wage loss verification, information which Defendant repeatedly requested and was never provided. Without these relevant and important records and other information crucial to her claim, Defendant acted reasonably in denying her claim on these facts.

        **c.**    **The Settlement Offer**

Plaintiff argues that the evidence demonstrates that Defendant valued Plaintiff's claim at between $110,000–$120,000 before offsets. (#42 at 13:16–21.) On this fact pattern, this evaluation of the claim by an adjuster that was overruled by the adjuster's supervisor is not an indicia of unreasonableness. Plaintiff bases this assertion on adjuster Schrader-Frith's attempt to obtain a

settlement authorization. On her report, Ms. Schrader-Frith attached a handwritten note which read, "Total value $110-120, autho to settle 9-19." Plaintiff's position is that this note suggests that Defendant placed the total value of Plaintiff's claim at between $110,000 – $120,000, which means that, after an offset of $100,000 for the settlement with the tortfeasor, the settlement value of the claim was between $10,000 and $20,000. Plaintiff concludes that Defendant's unwillingness to settle the claim in spite of this objective evaluation amounts to unreasonable behavior and thus bad faith. Defendant counters that Ms. Schrader-Frith simply sought authorization to "buy a release" from liability and settle the claim, and that the note in no way amounts to an objective evaluation of Plaintiff's claim. Defendant also contends that Ms. Schrader-Frith's manager did not grant the authorization in any event, and if anything the handwritten note is merely Ms. Schrader-Frith's assessment of the claim and not Defendant American Family's assessment of the claim. (#49 at 4:7–11.) The adjuster's actions do not weigh heavily enough to constitute a genuine issue of material fact as to the good faith basis for the denial of the claim.

**D.     Punitive Damages**

Defendant has separately moved for summary judgment on the issue of punitive damages. Defendant contends that, even if Plaintiff has raised issues of fact to support a claim for bad faith, she cannot possibly prevail on the issue of punitive damages under N.R.S. 42.005. Plaintiff responds that "evidence of [Defendant] American Family's oppressive conduct is plentiful." (#42 at 19:17.) Plaintiff raises three arguments in support of an award for punitive damages. First, Plaintiff claims that Defendant had notice of Plaintiff's UIM claim when Plaintiff's attorney submitted a letter of representation on February 15, 2005, but nonetheless failed to investigate the claim until a year later when the formal claim demand package was submitted. (#42 at 19:26–20:3.) Second, Plaintiff suggests that Defendant's constant requests for information about her claim were intended only to make her "jump through useless hoops," and that Plaintiff's failure to provide the requested information was merely a "pretext to deny Plaintiff's claim. (#42 at 20:17–21.) Third, Plaintiff

1 claims that Defendant denied her UIM claim "in spite of [Defendant's] own evaluation which
2 showed it to have a value between $9,000 and $19,000." (#42 at 19:18–20.)

3       Proof of an insurer's bad faith, by itself, is insufficient to support a punitive damage award
4 under Nevada law. *United Fire Ins. Co. V. McClelland*, 780 P.2d 193, 198 (Nev. 1989.) Rather,
5 punitive damages are awarded only when a Plaintiff can prove "by clear and convincing evidence"
6 that the defendant is guilty of malice, fraud or oppression. N.R.S. 42.005. Clear and convincing
7 evidence is defined as "evidence establishing every factual element to be highly probable." *In re*
8 *Discipline of Drakulich*, 908 P.2d 709 (Nev. 1995) (quoting *Butler v. Poulin*, 500 A.2d 257, 260 n.5
9 (Me.1985)). Plaintiff claims that punitive damages can be supported by the "oppression" language
10 of the statute. Oppression is defined as "despicable conduct that subjects a person to cruel and unjust
11 hardship with conscious disregard for the rights of that person." N.R.S. 42.001(4).

12       None of the evidence adduced by Plaintiff suggests that Defendant committed "despicable
13 conduct that subjected [her] to cruel and unjust hardship," as N.R.S. 42.001(4) requires. None of
14 the specific conduct pointed to by Plaintiff could convince a reasonable factfinder "by clear and
15 convincing evidence" that Plaintiff had been oppressed. Thus, the Court GRANTS summary
16 judgment in favor of the Defendant on the issue of punitive damages.

17       In support of her contention that punitive damages are appropriate in this case, Plaintiff cites
18 *United Fire Ins. Co. v. McClelland*, 780 P.2d 193, 198 (Nev. 1989). Plaintiff avers that *McClelland*
19 stands for the proposition that **"**failure to divulge pertinent information to [a company's] insured or
20 a failure to investigate may warrant imposition of punitive damages." (#42 at 19:13–16) (emphasis
21 omitted). However, the facts of *McClelland* were a good deal more egregious than those in the case
22 at bar. In *McClelland*, the defendant insurance company had experienced financial difficulties, and
23 was ordered to cease doing business in Nevada. *McClelland,* 780 P.2d at 194. The insurance
24 company sent correspondence to its insureds, cautioning them not to drop their policy or change their
25 insurance. *Id.* The letter said nothing about the cease and desist order. *Id.* The insurance company

eventually transferred all of its policies to another company, but did nothing to evaluate that company's reputation or financial condition. *Id.* at 198. The defendant company's conduct lead to the plaintiff accumulating unpaid medical bills and delaying treatment for a kidney infection. *Id.* at 195–96. The Nevada Supreme Court determined that the defendant's failure to disclose the cease and desist letter, combined with its failure to investigate the insurance company to which it transferred its policies, supported a punitive damage award. *Id.* at 198.

It is quite a leap to assert that, under *McClelland*, Defendant breached duties to disclose and duties to investigate that give rise to a punitive damage award. Plaintiff claims that Defendant's failure to investigate Plaintiff's claim between February 15, 2005 (when it received the letter of representation) and June 19, 2006 (when it received the formal demand package) gives rise to a claim of punitive damages. This argument fails for two reasons. First, it is unclear whether Defendant had any duty to begin investigating Plaintiff's claim when it received the representation letter. Indeed, that letter only asked Defendant to verify its coverage because "it *may* become necessary to file a claim under [Plaintiff's UIM] policy." (#35 Ex. A) (emphasis added). Thus, Defendant had no reason to believe that Plaintiff was seeking recovery under the policy; indeed, the letter expressly said that a claim *may* be filed at some point in the future.

Similarly, Plaintiff's contention that Defendant's requests for information constitute harassment or a failure to investigate does not support punitive damages as a matter of law. Plaintiff contends that Defendant's constant requests for pictures of the vehicle and information about her settlement with the tortfeasor were improper because Defendant had better access to this information than did Plaintiff. Regardless of the access Defendant may have had to the vehicle or other insured in the case, its requests for information were reasonable and performed in the normal course of its duties.

Finally, Plaintiff's contention that claims adjuster Schrader-Frith's note seeking authorization to settle Plaintiff's claim for between $9,000 and $19,000, combined with Defendant's subsequent

denial of the claim, is oppressive behavior because Defendant is "forcing Plaintiff to sue for the amounts that [Defendant] agrees she is entitled." (#42 19:22–25.) This argument fails because the hand-written note, which was never ultimately authorized by Ms. Schrader-Frith's manager, cannot possibly establish by clear and convincing evidence that Defendant "agreed that Plaintiff was entitled" to the settlement.

### E.  Unfair Claims Practices Act

Defendant asserts that it is entitled to summary judgment on Plaintiff's Unfair Claims Practices Act claims because "there is no evidence that Defendant American Family violated any section of the Unfair Claims Practices Act . . . .  Instead, Plaintiff Lopez is aggrieved because American Family concluded that her UIM coverage was not available based on the information she provided." (#35 at 24:18–21.)  Plaintiff responds that arguing that Defendant violated the act by: (1) misrepresenting Plaintiff's coverage by failing to inform Plaintiff of her rental reimbursement coverage (as required by N.R.S. 686A.310(1)(a)); (2) failing to promptly investigate Plaintiff's claim (as required by N.R.S. 686A.310(1)(b)); (3) attempting to settle the claim for less than the amount that a reasonable person would have believed that he is entitled by reference to written or printed advertising material accompanying or made part of its application (as required by N.R.S. 686A.310(1)(g)).

The Nevada Unfair Claims Practices Act confers a private cause of action on insured individuals.  N.R.S. 686A.310(2); *see also Crystal Bay General Imp. Dist. v. Aetna Cas. & Sur. Co.*, 1989, 713 F. Supp. 1371, 1388 (D. Nev.1989).  However, the Fair Claims Standards Act sets out a unique standard for violative conduct as compared to bad faith claims.  *See Pioneer Chlor Alkali Co. v. National Union Fire Ins. Co.*, 863 F. Supp. 1237, 1243 (D. Nev. 1994).  Thus, proving a violation of the Fair Claims Standards Act does not necessarily prove bad faith, or vice versa.  *See id.*  Defendant demonstrates no genuine issues of material fact remain as to the rental reimbursement coverage, the time of investigation of Plaintiff's claim, or the "settlement" claim.  Accordingly,

1  Defendant did not violate the unfair claims practices act and summary judgment is GRANTED to
2  that effect.

### F. Breach of Fiduciary Duty

Plaintiff's complaint claimed that Defendant, as an insurer, breached its fiduciary duty to Plaintiff by denying her claim. (#1 at ¶¶ 27–34.) Because Nevada law does not support such a claim against an insurance company, the Court GRANTS summary judgment on this claim. In *Powers v. United Services Automobile Association* 962 P.2d 596, 603 (Nev. 1998), the Nevada Supreme Court stated that insurance companies owe a duty to their insureds that is "fiduciary in nature." However, the court explicitly stated that "[they were] not adopting a new cause of action based on an insurance company's failure to put its insured's interests above its own; [they were] merely recognizing that breach of the fiduciary nature of the insurer-insured relationship *is part of the duty of good faith and fair dealing.*" *Id.* (emphasis added). Thus, Plaintiff's breach of fiduciary duty claim is essentially a restatement of her bad faith claim. Summary judgment is GRANTED to the claim of a breach of fiduciary duty.

### G. Estoppel

Finally, Plaintiff's complaint alleged that Defendant is estopped from denying coverage. (#1 at ¶¶ 49–56.) Plaintiff seems to have abandoned this claim, as she does not mention it in her Response. (See generally #42.) In any event, this seems to be a redundant restatement of Plaintiff's breach of contract claim. Thus, the Court GRANTS summary judgment on the estoppel claim.

## IV. CONCLUSION

IT IS HEREBY ORDERED that Defendant's Motion for Partial Summary Judgment as to the five claims: (1) intentional infliction of emotional distress; (2) breach of the implied covenant of good faith and fair dealing; (3) violation of the Unfair Claims Practices Act; (4) breach of fiduciary duty, and (4) estoppel is GRANTED.  (#35.)

DATED: July 13, 2009

                                    _____
                                          ROBERT C. JONES
                                    UNITED STATES DISTRICT JUDGE